## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

SANTANU DE,                              )
                                         )
      Plaintiff,                      )
                                         )        No. 11 C 4521
    v.                                   )
                                         )        Judge Ruben Castillo
CITY OF CHICAGO, a municipal             )
corporation,                             )
                                         )
      Defendant.                     )

## MEMORANDUM OPINION AND ORDER

Plaintiff Santanu De ("De") brings this suit against the City of Chicago ("the City")
alleging illegal discrimination on the basis of race in violation of 42 U.S.C. § 1981 and illegal
discrimination on the bases of national origin and sex in violation of the Illinois Human Rights
Act ("IHRA"), 775 Ill. Comp. Stat. 5/1-101 *et seq.* (R. 23, Second Am. Compl.) Presently
before the Court is the City's motion for summary judgment pursuant to Rule 56 of the Federal
Rules of Civil Procedure. (R. 40, Def.'s Mot.) For the reasons set forth herein, the City's
motion is granted.

## RELEVANT FACTS[1]

Before summarizing the material facts that give rise to this case, the Court notes that the
City has objected to several of De's responses to its statement of material facts as well as several
of De's statements of additional facts for failure to comply with Rule 56(c) of the Federal Rules

---

[1] The Court takes the undisputed material facts of the case from the parties' Local Rule 56.1
statements of material facts. (R. 43, Defendant's Local Rule 56.1 Statement of Material Facts
("Def.'s Facts"); R. 46, Plaintiff's Local Rule 56.1 Statement of Additional Facts ("Pl.'s Facts");
R.46, Plaintiff's Local Rule 56.1 Response to Defendant's Local Rule 56.1 Statement of Material
Facts ("Pl.'s Rule 56.1 Resp."); R. 47, Defendant's Local Rule 56.1 Response to Plaintiff's
Statement of Additional Facts ("Def.'s Rule 56.1 Resp.")).

1

of Civil Procedure and Rule 56.1 of the Northern District of Illinois's Local Rules. (R. 48, Def.'s Reply at 2-3.) These rules govern the manner by which parties to a cause of action within this District must submit their factual allegations either supporting or opposing a pending motion for summary judgment to the district court. Local Rule 56.1(b)(3)(B) concerns the nonmoving party's response to the moving party's Local Rule 56.1(a)(3) statement of material facts. Local Rule 56.1(b)(3)(B) requires that the opposing party file "a *concise* response to the movant's statement that shall contain a response to each numbered paragraph in the moving party's statement, including in the case of any disagreement, *specific references* to the affidavits, parts of the record, and other supporting materials relied on." N.D. Ill. L.R. 56.1(b)(3)(B) (emphasis supplied). The term "specific reference" means that a party must include "proper Bluebook citations to exact pieces of the record that support the contention contained in the paragraph. In other words, citations must include page (or paragraph) numbers, as opposed to simply citing an entire deposition, affidavit, or other exhibit document." *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000). "[A] general denial is insufficient to rebut a movant's factual allegations; the nonmovant must cite specific evidentiary materials justifying the denial." *Id.* at 584.

"Local Rule 56.1(b)(3)(C) . . . sets out requirements for the nonmovant's statement of additional facts that are identical to the obligations imposed on the movant's statement of facts." *Id.* The Rule provides that the party opposing the summary judgment motion shall file "a *concise* response to the movant's statement that shall contain a statement, consisting of *short* numbered paragraphs, of any additional facts that require the denial of summary judgment, *including references* to the affidavits, parts of the record, and other supporting materials relied upon." N.D. Ill. L.R. 56.1(b)(3)(C) (emphasis supplied). The nonmoving party's statement of additional facts must, like the moving party's submission, be "supported by *specific references* to

2

the record." *Malec*, 191 F.R.D. at 584 (emphasis supplied). The opposing party's statement of

additional facts should contain only factual allegations; it is improper to make legal arguments in

a Local Rule 56.1(b)(3)(C) statement. *Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) (A

party's "statement of material facts [does] not comply with Rule 56.1 [if] it fail[s] to adequately

cite the record and [is] filled with irrelevant information, legal arguments, and conjecture[.]");

*Malec*, 191 F.R.D. at 583 ("It is inappropriate to allege legal conclusions in a 56.1(a) statement

on the off-chance that one's opponent might not file a correct response."). Furthermore, the

nonmovant's Local Rule 56.1(b)(3)(C) statement must be limited to *material* facts—that is, facts

which are relevant to the outcome of the issues presented by the movant's summary judgment

motion. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994) (The nonmoving

party "need only come forward with appropriate evidence demonstrating that there is a pending

dispute of *material* fact.") (emphasis supplied). The numbered paragraphs contained in the

opposing party's statement of additional facts must be short—with each paragraph containing

only one or two individual allegations. *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th

Cir. 2009) ("[T]he numbered paragraphs should be short; they should contain only one or two

individual allegations, thereby allowing easy response.") (quoting *Malec*, 191 F.R.D. at 583)

(internal quotation marks omitted).

    The Seventh Circuit has repeatedly "held that a district court has broad discretion to

require strict compliance with Local Rule 56.1." *Judson Atkinson Candies, Inc. v. Latini-*

*Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008); *see also Cracco*, 559 F.3d at 632

("Because of the important function local rules like Rule 56.1 serve in organizing the evidence

and identifying disputed facts, we have consistently upheld the district court's discretion to

require strict compliance with those rules.") (quoting *F.T.C. v. Bay Area Bus. Council, Inc.,* 423

F.3d 627, 633 (7th Cir. 2005)) (internal quotation marks omitted); *Waldridge*, 24 F.3d at 922 (collecting cases) ("We have also repeatedly upheld the strict enforcement of these rules[.]"). "Substantial compliance is not strict compliance." *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004). Consistent with its broad grant of discretion, this Court strictly enforces Local Rule 56.1.

Accordingly, many of the City's objections to De's responses and additional facts are sustained. First, as the City points out, many of De's responses to the City's statement of material facts, as well as his statement of additional facts, contain allegations that either misstate the cited record or are unsupported by citations to the record. (R. 48, Def.'s Reply at 3.) The nonmovant's responses to the movant's factual allegations, as well as the nonmovant's statement of additional facts, must "be supported by specific references to the record." *Malec*, 191 F.R.D. at 584. Under Local Rule 56.1, it is improper for a party to misstate the cited record. *Nat'l Inspection Repairs v. George S. May Int'l Co.*, No. 03—CV—5529, 2008 WL 4389834, at *2 (N.D. Ill. Sept. 24, 2008) ("The court agrees that certain of [the plaintiffs'] responses or additional facts improperly state legal conclusions, *assert facts not supported by the record, or misstate the evidence*[.]") (emphasis supplied). "[A] mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material." *Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir. 2003) (citing *Edward E. Gillen Co. v. City of Lake Forest,* 3 F.3d 192, 196 (7th Cir. 1993)). The consequence of De's failure to comply with Local Rule 56.1 by neglecting to cite the record in many of his responses is that those responses are disregarded by the Court, and the City's factual allegations to which they are directed are deemed admitted.[2]

---

[2] Accordingly, the Court finds that the following responses to the City's statement of material facts, (R. 46, Pl.'s Rule 56.1 Resp.), fail to satisfy Local Rule 56.1, and therefore strikes them: ¶¶ 2, 8-12, 21, 23-25, 29-38, 42, 48, 52, 54-57, 59, 62, 63, 65, 72, and 75. .

*See* N.D. Ill. L.R. 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."); *Smith*, 321 F.3d at 683 ("Local Rule 56.1's enforcement provision provides that when a responding party's statement fails to controvert the facts as set forth in the moving party's statement in the manner dictated by the rule, those facts shall be deemed admitted for purposes of the motion.") (internal citations omitted). In addition, several paragraphs in De's Local Rule 56.1(b)(3)(C) statement of additional facts fail to comply with the mandate of Local Rule 56.1 that all factual allegations must "be supported by specific references to the record." *Malec*, 191 F.R.D. at 584. The Court therefore disregards these facts.[3]

Second, the City also notes that many of De's responses to the City's statement of material facts, as well as many of De's statement of additional facts, contain vague, argumentative, immaterial, or conclusory assertions. (R. 48, Def.'s Reply at 3.) The nonmoving party's response to the moving party's statement of additional facts and statement of additional facts must represent only *material* facts, and a Local Rule 56.1(b)(3)(C) statement of additional facts and a Local Rule 56.1(b)(3)(B) response are not the proper province of argumentative or conclusory allegations. *Basta v. Am. Hotel Register Co.*, No. 10—CV—4003, 2012 WL 88187, at *2 (N.D. Ill. Jan. 11, 2012). Conclusory allegations are forbidden under Local Rule 56.1. *Roger Whitemore's Auto. Servs., Inc. v. Lake Cnty., Ill.*, 424 F.3d 659, 674 (7th Cir. 2005). Arguments (even if they are conclusory) belong in the supporting memorandum of law in opposition to summary judgment. *Id.* In addition, the nonmoving party cannot rely on vague assertions in his Local Rule 56.1(b)(3)(C) statement of additional facts or his Local Rule

---

[3]  The Court strikes the following additional facts, (R. 46, Pl.'s Facts), for De's failure to comply with Local Rule 56.1: ¶¶ 1, 2, 3, 5, 7-10, 12, 13, 14, 16, 17, 18, 21, 22, 24, 25, 27, 28, 29, 31, 34, and 35.

56.1(b)(3)(B) response because the moving party must be able to ascertain the allegations made by the nonmoving party so that it may properly respond in accordance with the procedures of Local Rule 56.1. *Greer v. Bd. of Educ. of City of Chi., Ill.*, 267 F.3d 723, 727 (7th Cir. 2001) (A plaintiff who completely failed to comply with Local Rule 56.1 "obfuscated the true issues at stake and . . . served only to further burden an already burdened judicial system and to frustrate the [defendant's] attempts to marshal its resources in a targeted defense against his allegations."); *Creative Trade Grp., Inc. v. Int'l Trade Alliance, Inc.*, No. 08—CV—2561, 2009 WL 3713345, at *6 (N.D. Ill. Nov. 4, 2009) (the district court used its authority to strike the defendant's Local Rule 56.1 response in its entirety for failure to comply with the local rule because the responses were vague); *Raube v. Am. Airlines, Inc.*, 539 F. Supp. 2d 1028, 1031-32 (N.D. Ill. 2008) ("Rather, the Opposition contains only vague descriptions of a few potential factual issues and then states in a conclusory manner that each is a 'genuine issue of material fact.' As such, Plaintiff's Opposition fails to satisfy Local Rule 56.1.") (internal citation omitted). Furthermore, evasive responses violate Local Rule 56.1. *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 808 (7th Cir. 2005). Under Local Rule 56.1 factual assertions must be specific, concrete, and particularized. *Smith*, 321 F.3d at 682. The Court finds that De failed to comply with Local Rule 56.1 by relying on vague, argumentative, immaterial, or conclusory assertions, and the Court therefore disregards those responses and additional facts.[4] As a result, the City's facts to which the improper responses are directed are deemed admitted. *See* N.D. Ill. L.R. 56.1(b)(3)(C); *Smith,* 321 F.3d at 683.

---

[4] The Court strikes the following responses to the City's facts, (R. 46, Pl.'s Rule 56.1 Resp.), for De's failure to comply with Local Rule 56.1: ¶¶ 2, 8-12, 23-25, 29-39, 42, 43, 46, 48, 52, 54-57, 59, 62, 63, 65, 71, 72, and 75. The Court also strikes the following additional facts, (R. 46, Pl.'s Facts), for De's failure to comply with Local Rule 56.1: ¶¶ 1-13, 15-20, and 22-35.

6

Third, the City argues that many of De's responses to the City's statement of material facts, as well as his statement of additional facts, consist of nothing more than purely speculative factual allegations. (R. 48, Def.'s Reply at 3.) Speculative assertions are improper under Local Rule 56.1. *Borcky v. Maytag Corp.,* 248 F.3d 691, 695 (7th Cir. 2001) ("The mere existence of some alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment. . . .Speculation will not suffice.") (internal citations and quotation marks omitted); *Bradley v. Work,* 154 F.3d 704, 708 (7th Cir. 1998) (Where the district court exercises its discretion to mandate strict compliance with Local Rule 56.1, the Court of Appeals "need not delve into the record and try to guess which parts of the [plaintiffs'] submissions were . . . [improper] speculations[.]") (internal quotation marks omitted). The Court finds that De failed to comply with Local Rule 56.1 by relying on speculative allegations both in his responses to the City's statement of material facts and in his statement of additional facts, and therefore the Court disregards these facts and responses.[5] The City's facts to which the improper responses are directed are thus deemed admitted. *See* L.R. 56.1(b)(3)(C); *Smith,* 321 F.3d at 683.

Fourth, the City contends that several of De's responses to the City's statement of material facts, as well as his statement of additional facts, contain inadmissible hearsay. (R. 48, Def.'s Reply at 3.) Hearsay is just as inadmissible at summary judgment as it is at trial. *Eisenstadt v. Centel Corp.,* 113 F.3d 738, 742 (7th Cir. 1997). A party cannot rely on hearsay in a Local Rule 56.1(b)(3)(C) statement of additional facts or a Local Rule 56.1(b)(3)(B) response. *Rogers v. City of Chi.,* 320 F.3d 748, 751 (7th Cir. 2003) ("The district court also struck [the plaintiff's] Local Rule 56.1 submission, . . . [because it] contained inadmissible hearsay."). The

---

[5]  The Court finds that the following responses to the City's statement of material facts, (R. 46, Pl.'s Rule 56.1 Resp.), fail to satisfy Local Rule 56.1, and therefore strikes them: ¶¶ 21, 32-38, and 75. The Court further finds that the following additional facts, (R. 46, Pl.'s Facts), also violate Local Rule 56.1, and therefore strikes them: ¶¶ 1, 2, 4, 15, and 27.

Court finds that De violated Local Rule 56.1 by relying on inadmissible hearsay, and it disregards his responses to the City's statement of material facts, as well as those additional facts that contain inadmissible hearsay.[6] Accordingly, the City's facts to which the improper responses are directed are deemed admitted. *See* L.R. 56.1(b)(3)(C); *Smith,* 321 F.3d at 683.

Finally, a number of De's responses to the City's statement of material facts contain non-responsive additional facts that exceed the scope of the City's Local Rule 56.1(a)(3) statement of material facts. De sets forth additional facts in his Local Rule 56.1(b)(3)(B) response. It is improper, and a violation of Local Rule 56.1, for the nonmoving party to add additional facts to his Local Rule 56.1(b)(3)(B) response; the nonmoving party's additional facts belong in a *separate* statement. *Ammons,* 368 F.3d at 817 ("Rule 56.1 envisions *a separate statement* of additional facts.") (emphasis supplied). "Local Rule 56.1 *requires specifically* that a litigant seeking to oppose a motion for summary judgment file a response that contains a separate 'statement . . . of any additional facts that require the denial of summary judgment.'" *Cichon,* 401 F.3d 809 (quoting N.D. Ill. L.R. 56.1(b)(3)(B)). The nonmoving party's failure to allege his additional facts in a separate statement is a serious violation of Local Rule 56.1. *Ciomber v. Coop. Plus, Inc.,* 527 F.3d 635, 643 (7th Cir. 2008) (The opposing party's "response must contain both 'a response to each numbered paragraph in the moving party's statement,' and a *separate* statement 'consisting of short numbered paragraphs[ ] of any additional facts that require the denial of summary judgment[.]'") (citing N.D. Ill. L.R. 56.1(b)(3)(B)) (alterations in original); *Eason v. Nolan,* 416 Fed. App'x 569, 569-570 (7th Cir. 2011) ("[The plaintiff] opposed the motion, and in his response to [the defendant's] statements of material facts he

---

[6]  The Court finds that the following responses to the City's facts, (R. 46, Pl.'s Rule 56.1 Resp.), fail to satisfy Local Rule 56.1, and therefore strikes them: ¶¶ 32-38. The Court also finds that the following additional fact, (R. 46, Pl.'s Facts), violates Local Rule 56.1, and therefore strikes it: ¶ 4.

8

incorporated additional facts. But [the plaintiff] did not submit a *separate statement* of additional facts as required by Local Rule 56.1(b)(3), and so the district court refused to consider any of the new facts in his response. . . . [A] party runs afoul of the rule by commingling the separate requirements into one response.") (citing *Bay Area Bus. Council, Inc.*, 423 F.3d at 633). The Court finds that De failed to comply with Local Rule 56.1 by adding additional facts to his responses to the City's statement of material facts, and therefore the Court disregards them. Consequently the City's facts to which the improper responses are directed are deemed admitted.[7] *See* N.D. Ill. L.R. 56.1(b)(3)(C); *Smith*, 321 F.3d at 683.

The Seventh Circuit has made it clear that a district court possesses the discretion to strike in its entirety the nonmoving party's statement of additional facts where the nonmoving party fails to set out his additional factual allegations in a separate statement as called for by Local Rule 56.1(b)(3)(B). *Cichon*, 401 F.3d at 809-10 ("A district court does not abuse its discretion when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not consider the additional facts that a litigant has proposed.") (quoting N.D. Ill. L.R. 56.1(b)(3)(B)) (internal citations omitted); *Ammons*, 368 F.3d at 817 ("[W]e do not believe the district court abused its discretion when it struck the responses. Rule 56.1 envisions a separate statement of additional facts. In this case, several of [the plaintiff's] responses to [the defendant's] allegations admit to the allegation but then add other additional facts. These facts should have been included in a separate statement. They were not, and the district court did not abuse its discretion in striking the responses."); *Bordelon v. Chi. School Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000) (affirming the district court and finding

---

[7] The Court finds that the following responses to the City's statement of material facts, (R. 46, Pl.'s Rule 56.1 Resp.), violate Local Rule 56.1, and therefore strikes them: ¶¶ 2, 8-12, 23-25, 29, 30-38, 42, 48, 52, 54-57, 59, 63, 65, and 72.

9

that it did not abuse its discretion in striking the nonmoving party's response in its entirety rather than selectively, since the response's evasive denials and improper citations to legal argument rather than disputed facts defeated the purpose of the local rule governing such statements— namely to identify just what facts are actually in dispute in a concise format). The Court finds that De failed to comply with Local Rule 56.1 by putting additional factual allegations in his response to the City's statement of material facts rather than in a separate statement as required by Local Rule 56.1. Therefore, the Court strikes De's statement of additional facts in its entirety as a penalty for his failure to comply with Local Rule 56.1(b)(3)(B).

Because this Court demands strict compliance with Local Rule 56.1, *Judson Atkinson Candies, Inc.*, 529 F.3d at 382 n.2; *Cracco,* 559 F.3d at 632, many of De's responses to the City's statement of material facts are stricken for his failure to comply with Local Rule 56.1. In sum, the Court strikes ¶¶ 2, 8, 9-12, 21, 23-25, 29-39, 42, 43, 46, 48, 52, 54-57, 59, 62, 63, 65, 71, 72, and 75 of De's Local Rule 56.1(b)(3)(B) responses to the City's statement of material facts. As a result, all of the City's facts to which these improper responses are directed are deemed admitted. *See* L.R. 56.1(b)(3)(C); *Smith,* 321 F.3d at 683. The Court also strikes De's Local Rule 56.1(b)(3)(C) statement of additional facts in its entirety as a penalty for failing to comply with Local Rule 56.1. Therefore, in ruling on the City's motion for summary judgment, the Court will rely on De's responses to the City's statement of material facts that have not been stricken by the Court for failure to adhere to the requirements of Local Rule 56.1, as well as the City's Local Rule 56.1(a)(3) statement of material facts. Those are the facts that comply with the mandates of Local Rule 56.1 and therefore can be used on summary judgment.

**I.      De's employment with the Chicago Department of Transportation**

De is a male of Indian national origin who currently holds the position of Principal Systems Analyst in the City's Independent Police Review Authority. (R. 46, Pl.'s Rule 56.1 Resp. ¶ 1.) He has held that position since August 1, 2010. (*Id.*) De worked for the Chicago Department of Transportation ("the CDOT"), formerly the Department of Public Works, as an at-will employee from 1987 until he was laid off in a citywide budgetary reduction in force ("RIF") on December 31, 2008. (R. 42, Def.'s Facts ¶ 2.) The City is a municipal corporation incorporated under the laws of the State of Illinois. (R. 46, Pl.'s Rule 56.1 Resp. ¶ 3.)

On January 16, 1987, De was appointed to the position of Electrical Engineer I in the IT section of the CDOT. (R. 42, Def.'s Facts ¶ 8.) As an Electrical Engineer I, De's duties related to computer software programing. (*Id.*) The software kept track of the work that was being done or planned by the CDOT, and also kept track of the work's progress. (*Id.*) De's duties as an Electrical Engineer I also included making sure that the computer software worked with a new system that the CDOT was migrating to at that time. (*Id.*) On December 1, 1988, De was appointed to the position of Applications Designer in the CDOT, which he considered to be a promotion. (*Id.* ¶ 9.) De had applied and interviewed for the position with the City's Department of Personnel. (*Id.*) De's duties as an Applications Designer related mostly to application development, but also included system support, application support, and server updates. (*Id.*) On January 1, 1992, De was appointed to the position of Senior Systems Engineer in the CDOT, which he considered to be a promotion. (*Id.* ¶ 10.) De had applied and interviewed for that position with the City's Department of Personnel. (*Id.*) As a Senior Systems Engineer, De continued to support the CDOT's computer applications, and he also "help[ed]" two junior developers, by "watching their work," "[h]elping them standardize a few things," and "becoming the supervisor." (*Id.*; R. 43, Def.'s Facts, Ex. A, De Dep. at 20:10-21.)

On January 1, 1995, De was appointed to the position of Principal Systems Engineer in the CDOT. (R. 42, Def.'s Facts ¶ 11.) De cannot recall whether he applied for that position, or whether it was an "internal promotion." (*Id.*) De's duties remained "pretty much [the] same;" however he had "[m]ore responsibility toward system development, overall performance, functionality, and systems support." (*Id.*; R. 43, Def.'s Facts, Ex. A, De Dep. at 21:13-23.) On August 1, 1998, De was appointed to the position of Supervising Engineer in the CDOT. (R. 42, Def.'s Facts ¶ 12.) De cannot recall whether he applied for that position, or whether it was an "internal promotion." (*Id.*) As a Supervising Engineer, De had even more responsibilities, including supporting more applications and supervising three developers and one secretary. (*Id.*) In 2000, De received a Ph.D in Computer Science from the Illinois Institute of Technology. (R. 46, Pl.'s Rule 56.1 Resp. ¶ 13.) On January 1, 2001, De was appointed to the position of Chief Programmer/Analyst in the CDOT, which he considered to be a promotion. (*Id.* ¶ 14.) De received that position through an internal title change, and he held that position until he was laid off on December 31, 2008. (*Id.*)

## II.    The City's hiring and promotion processes prior to October 2007

The City used several hiring and promotion practices during De's term of employment with the CDOT. (R. 42, Def.'s Facts ¶¶ 23-24.) Prior to 2005, the City maintained a paper-based system under which it screened applications for positions and placed qualified individuals on eligibility lists. (*Id.* ¶ 23.) If and when a position became available, the City would call the candidates on the appropriate eligibility lists for interviews in lottery order. (*Id.*) In May 2005, the City transitioned to an online hiring system. (*Id.* ¶¶ 24-25.) As part of the move to the new system, the City abandoned its then-existing eligibility lists and initiated a new round of application screening. (*Id.* ¶ 24.) From May 2005 through September 2007, positions were

posted by title to the City's online hiring system. (*Id.* ¶ 25.) Once the job announcement for a position closed, a Recruiter in the City's Department of Personnel (which became the Department of Human Resources on January 1, 2008), screened the applications to determine which applicants met the minimum qualifications for the position. (*Id.*) The applicants who met the minimum qualifications were placed on an eligibility list for the position. (*Id.*) The eligibility lists created during this new round remained valid for two years. (*Id.* ¶ 24) The Recruiter then waited to receive a "Request for Hire Form," which notified the Recruiter that one of the City's departments had an opening for a particular position and listed the department's additional screening criteria for that position. (*Id.* ¶ 25)

## III.    The Director of Information Systems position

In 2001, the City created the Director of Information Systems ("DIS") position of the CDOT. (R. 46, Pl.'s Rule 56.1 Resp. ¶ 20.) De maintains that he met all of the qualifications for the position and applied for the job. (*Id.*) The City, however, did not select De for the DIS position. (*Id.*) Instead it appointed CDOT employee Christopher Jaeger, a Caucasian male of United States national origin, to the DIS position. (*Id.*)

In February 2007, the CDOT again sought to fill the DIS position. (R. 42, Def.'s Facts ¶¶ 32-33.) The CDOT began evaluating candidates on the March 11, 2007 eligibility list. (*Id.*) At that time, De incorrectly believed that he was on the eligibility list for the DIS position. (*Id.* ¶ 31.) The City's records reflect that on December 31, 2003, the eligibility list for the DIS position that included De's name had expired. (*Id.* ¶ 29.) The City's records also reflect that De was placed on referral lists for the DIS position on March 11, 2005 and August 9, 2005, but was not selected by the hiring departments. (*Id.*) De cannot recall when he applied for the DIS position between June 2002 and May 2008, nor does he have any records of applications that he

13

submitted for the DIS position during that time period. (*Id.* ¶ 30.) As of March 11, 2007, De was not one of the forty-nine applicants on the eligibility list for the DIS position. (*Id.* ¶ 31.) Because he was not on the eligibility list, De was not considered for the 2007 DIS vacancy. (*Id.*)

On or about February 16, 2007, the Department of Personnel received a Request for Hire Form that was submitted by the CDOT for the DIS position. (*Id.* ¶ 32.) The Department of Personnel rated the applicants on the March 11, 2007 DIS eligibility list, which included Lawrence Olszak, on each of the five additional screening criteria that the CDOT had provided the Department of Personnel. (*Id.* ¶ 33.) The CDOT's additional screening criteria provided that applicants have: (1) at least five years of previous experience managing a technology section within a municipal government working environment; (2) at least three years of previous experience managing server migration projects; (3) at least three years of previous experience in budgeting the purchase of computer hardware and software packages; (4) at least three years of previous project management experience with GPS vehicle tracking technologies and mobile technologies; and (5) previous experience in positions in the CDOT. (*Id.*) For each criterion, the applicants were given a "0" if they did not meet the requirement, a "1" if they satisfied the requirement, and a "2" if they exceeded the requirement. (*Id.* ¶ 34.) Each of the ratings were then multiplied by "2," which was the weight assigned to each criterion. (*Id.*) The total scores for each criterion were then added together to determine an applicant's total score. (*Id.*) The nine applicants for the DIS position who received a total score of 6 or 8 on the additional screening criteria, which included Olszak, were referred to the CDOT for interviews. (*Id.* ¶ 35.) Olszak and the six other applicants who were still interested in the DIS position were interviewed by then-Deputy Commissioner of the CDOT, Gilberto Quinones, and by the CDOT's Director of Finance, James Nolan. (*Id.* ¶ 36.) Quinones and Nolan separately rated

14

each interviewee on a scale of one to five on four hiring criteria. (*Id.* ¶ 37.) Of the seven candidates who were interviewed by the CDOT for the DIS position, Olszak received the highest average rating. (*Id.* ¶ 38.) In June 2007, the Department of Personnel and the Federal Monitor's Office reviewed and approved the hiring process that led to Olszak's appointment as the DIS of the CDOT. (*Id.* ¶ 38.)

**IV.    De's loss of supervisory authority and his relocation to a cubicle**

When Jaeger became the DIS, De maintains that he began to lose supervisory authority within the CDOT. (R. 46, Pl.'s Rule 56.1 Resp. ¶ 40.) At that time, he went from being "second in command," with responsibility for supervising "at least seven or eight people" to supervising only the "core application group." (*Id.*; R. 46, Pl.'s Rule 56.1 Resp., Ex. A, De. Dep. at 25:17-27:3.) When Olszak replaced Jaeger as the DIS in 2007, De was relocated from an office to a cubicle. (R. 46, Pl.'s Rule 56.1 Resp. ¶ 41.) De maintains that he was relocated while Helen Rane Carbone, a Caucasian female of United States national origin, Michelle Bonadurer, a Caucasian female of United States national origin, and Michael Baldridge, a Black male of United States national origin, were all allowed to keep their offices, notwithstanding the fact that De had more seniority and an equal or higher job title than each of these co-workers. (*Id.*)

Carbone, who has worked for the City since November 1985, and for the CDOT since December 1998, has held the title of Chief Programmer/Analyst in the CDOT since November 2005. (R. 42, Def.'s Facts ¶ 42.) Bonadurer has held the title of Administrative Assistant in the CDOT since January 2001. (*Id.* ¶43.) Bonadurer is responsible for all of the cell phones that are assigned to CDOT employees. (*Id.*) Her duties include procuring the cell phones from vendors, inventorying the phones, and programming them. (*Id.*) Baldridge has held the title of Staff Assistant in the CDOT since June 2000. (*Id.* ¶ 44.) Baldridge's duties relate to computer

hardware, including assigning log-in IDs to new CDOT employees, making sure CODT employees have access to the server and directories, and coordinating with the CODT and division heads on the installation of new computer equipment. (*Id.*) Olszak told De that he moved him to the cubicle in order to improve communications between technical employees. (R. 42, Def.'s Facts ¶ 46.)

**V.     The City's December 31, 2008 budgetary reduction in force**

On or about August 6, 2008, the CDOT received a memorandum directed to all City Department Heads from the City's then-Budget Director, Bennett Johnson. (R. 46, Pl.'s Rule 56.1 Resp. ¶ 50.) The memorandum advised the departments that the City's budget crisis required them to make additional cuts in their budgets, and it set a reduction target for each department. (*Id.*) At the direction of the Commissioner of the CDOT, Thomas Byrne, the then-First Deputy Commissioner of the CDOT, Thomas Powers, formed a working group. (*Id.* ¶ 51.) The working group was composed of James Crocker, the then-Manager of Finance of the CDOT, Thomas Carney, the then-Assistant Commissioner of the CDOT, and Powers. (*Id.*) The working group met several times in order to prepare a recommendation to present to Commissioner Byrne regarding the personnel and spending cuts that the working group believed the CDOT should make in order to meet the reduction target set by the City's Budget Office. (R. 42, Def.'s Facts ¶ 52.)

Powers tasked Carney with reviewing the Personnel Rules, the applicable collective bargaining agreements ("CBAs"), and a list of CDOT employees, in which the employees were classified by position and union status, so that Carney could verify that the RIF process complied with the procedures set forth in the CBAs and the City's Personnel Rules. (R. 46, Pl.'s Rule 56.1 Resp. ¶ 53.) Powers, as the second-in-command of the CDOT, was knowledgeable about the

function of each of the CDOT's six Divisions and about the computer systems that were vital to the CDOT's operations. (R. 42, Def.'s Facts ¶ 54.) Powers was also familiar with the employees who worked on those systems and with those who had duties related to the key services that the CDOT provided. (*Id.*) Crocker was knowledgeable about the computer systems that the CDOT used to track expenditures, and was familiar with the employees who worked on those systems. (*Id.* ¶ 55.)

De was one of the employees who was recommended for layoff by the working group. (*Id.* ¶ 56.) The working group recommended De for layoff because it determined that he did not have duties that were essential to the operations of the IT section in which he worked or to the operations of the CDOT as a whole. (*Id.*) Specifically, the working group discussed the fact that many of the computer systems on which De worked were either being phased out, becoming obsolete, or were, or could be, supported by other CDOT employees. (*Id.* ¶ 57.) Therefore, the working group determined that eliminating De's position would only minimally impact the operations of the CDOT. (*Id.*)

Although De and Carbone had the same job title, De's assignments were generally technical in nature, while Carbone's duties were largely administrative or managerial. (R. 46, Pl.'s Rule 56.1 Resp. ¶ 58.) Carbone's duties included administering the access rights of the users of the CDOT's computer systems, addressing user complaints, conducting administrative troubleshooting, handling Freedom of Information Act requests, and dealing with all tasks that came from the Commissioner's office. (*Id.* ¶ 60.) Carbone already had these duties before being promoted to the Chief Programmer/Analyst position. (*Id.*) The working group discussed Carbone and decided that she had duties that were critical to the operations of the CDOT. (R. 42, Def.'s Facts ¶ 59.) For example, Carbone had responsibilities related to the CDOT's

17

Aldermanic Menu Program, which was one of the CDOT's largest projects. (*Id.*) Therefore, the working group did not recommend laying off Carbone in the December 2008 RIF. (*Id.*)

The working group did not seek the input of any CDOT employees, other than Commissioner Byrne, as to which CDOT personnel should be recommended for layoff in the RIF. (R. 46, Pl.'s Rule 56.1 Resp. ¶ 61.) The working group did not consider employees' races, national origins, or genders when deciding which CDOT employees should be recommended for layoff. (R. 42, Def.'s Facts ¶ 62.) The list of recommended budget cuts, which was prepared by Crocker, included the names of employees whose termination would have the least significant impact on the operations of the CDOT. (*Id.* ¶ 63.) The final decision as to which CDOT employees were terminated in the RIF was made by Commissioner Byrne. (R. 46, Pl.'s Rule 56.1 Resp. ¶ 64.) Ultimately, twenty-four CDOT employees were laid off in the December 31, 2008 RIF. (R. 42, Def.'s Facts ¶ 65.) Seventeen of those employees, including De, were non-union members. (*Id.*) Ten of the twenty-four identified their gender as female; eleven identified their race as Caucasian; six identified their race as Black; four identified their race as Hispanic; two identified their race as Asian; and one identified his race as Native American. (*Id.*)

On or about November 12, 2008, De was handed a letter that notified him that he was to attend a meeting regarding the RIF on November 14, 2008. (R. 46, Pl.'s Rule 56.1 Resp. ¶ 66.) On that day, De met with Carney, John McDonough, a Deputy Commissioner of the CDOT, and an employee from the Department of Personnel whose name De does not recall. (*Id.*) During the meeting, De was informed that he was being laid off as part of the RIF and that it was within the Commissioner's sole discretion as to which employees were laid off. (*Id.*) De did not speak with Commissioner Byrne about the layoff. (*Id.* ¶ 67.) De received a RIF Notice on December 23, 2008. (*Id.* ¶ 68.) De also received a "nice" letter from Commissioner Byrne that thanked

him for his years of service with the CDOT and "expressed his sadness that there [was] a layoff." (*Id.* ¶ 69; R. 43, Def.'s Facts, Ex. A, De Dep. at 124:3-16.)

De understands that RIFs are "necessary" from "time to time" due to a "budgetary requirement that the City needs to adjust their expenses, and one of the expense [sic] is personnel." (*Id.* ¶ 70; R. 43, Def.'s Facts, Ex. A, De Dep. at 124:3-16.) De is not aware of any Department of Personnel employee who "knowingly participated in and sanctioned the promotion and retention of less qualified Caucasian employees over non-Caucasian employees." (R. 46, Pl.'s Rule 56.1 Resp. ¶ 74; R. 43, Def.'s Facts, Ex. A, De Dep. at 177:14-19.) Furthermore, De did not hear anyone make any comments about his national origin in 2008. (R. 46, Pl.'s Rule 56.1 Resp. ¶ 73.) In addition, the City does not track the national origins of its employees, and pursuant to Sections 2-160-010 and 2-160-030 of the Municipal Code of Chicago, the City's express policy and practice prohibits discrimination on the basis of gender, race, and national origin. (R. 46, Pl.'s Rule 56.1 Resp. ¶¶ 75, 76.)

## PROCEDURAL HISTORY

On December 11, 2008, De filed charges of discrimination with the Equal Employment Opportunity Commission and the Illinois Department of Human Rights. (R. 23, Second Am. Compl. ¶ 4.) The Illinois Department of Human Rights dismissed the charge for lack of jurisdiction and lack of substantial evidence on March 3, 2011. (*Id.*)

De then commenced this action against the City in the Circuit Court of Cook County, Illinois. (*Id.*; R. 1, Not. Rem. at 1.) The City removed the suit to this Court on July 5, 2011, pursuant to 28 U.S.C. § 1441(b). (R. 1, Not. Rem.) De filed a first amended complaint on July 25, 2011, (R. 8, First Am. Compl.), and a second amended complaint on October 12, 2011, (R.

19

23, Second Am. Compl.). In his second amended complaint, De alleges three counts of illegal discrimination by the City. (R. 23, Second Am. Compl. ¶¶ 24-27, 29-31, 33-35.)

In Count I, De alleges unlawful discrimination on the basis of race in violation of 42 U.S.C. § 1981. (*Id.* ¶¶ 24-28.) De alleges that the City promoted "a less-qualified non-Asian individual in lieu of" himself in 2007, and routinely "promoted and retained" less-qualified non-Asian (and, more specifically, non-Indian) employees in such a manner as to constitute a discriminatory custom or usage with the force of law. (*Id.* ¶¶ 25-26.)

In Count II, De alleges unlawful discrimination on the basis of national origin in violation the IHRA, 775 Ill. Comp. Stat. 5/1-101 *et seq*. (*Id.* ¶¶ 29-32.) De alleges that the City treated him differently than it treated "similarly-situated employees of United States national origin," including Carbone and Olszak. (*Id.* ¶ 30.) According to De, such differential treatment includes the City's decision to include De in its layoffs instead of Carbone or Olszak. The City proffered a legitimate, nondiscriminatory reason for De's termination, however De maintains that the City's reason is pretextual. (*Id.* ¶ 31.)

In Count III, De alleges unlawful discrimination on the basis of sex in violation of the IHRA, 775 Ill. Comp. Stat. 5/1-101 *et seq*. (*Id.* ¶ 33). De alleges that the City's treatment of, and decision to terminate, him instead of similarly situated female employees (including Carbone) constitutes unlawful sex discrimination in violation of the Act. (*Id.* ¶ 34.) The City proffered a legitimate, nondiscriminatory reason for its actions, but De maintains that it is a mere pretext for illegal discrimination. (*Id.* ¶ 35.)

On March 15, 2012, the City filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (R. 40, Def.'s Mot.) In its motion, the City contends that De lacks evidence that the City had a "widespread policy, practice, or custom of discriminating

against Asian Indian employees, or that a person at the City with final policymaking authority caused or condoned the discrimination," and that therefore De cannot establish municipal liability under § 1981, which is fatal to his claim. (R. 41, Def.'s Mem. at 1-2.) The City also argues that De provides no evidence to support his discrimination claims under either § 1981 or the IHRA. (*Id.* at 2.) The City maintains that "De cannot point to any direct evidence of the City's allegedly discriminatory animus, nor can he establish a *prima facie* case through the indirect method." (*Id.*) The City asserts that there is no factual basis in this case to permit any inference that the CDOT took an adverse employment action against De that was actually motivated by an intent to discriminate against him based on his race, national origin, or sex. (*Id.*)

## LEGAL STANDARD

In deciding a motion for summary judgment, the Court does not evaluate the weight of the evidence, judge the credibility of the witnesses, or determine the ultimate truth of the matter; instead, it is the function of this Court in ruling on a motion for summary judgment to ascertain whether there exists a genuine issue of triable fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986). Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A disputed fact is 'material' if it might affect the outcome of the suit under governing law." *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson*, 477 U.S. at 255; *Omnicare Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011).

21

The moving party has the initial burden of demonstrating that it is entitled to judgment as a matter of law. *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008); *see also Celotex*, 477 U.S. at 322. The moving party "can prevail just by showing that the other party has no evidence on an issue on which that party has the burden of proof." *Branzinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1183 (7th Cir. 1993). Once the moving party has met this burden, the nonmoving party must "set forth specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Celotex*, 477 U.S. at 324. The nonmoving party may not rely on mere conclusions, allegations, or speculation to create a genuinely disputed issue of material fact. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (internal quotation marks omitted) (quoting *Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001)); *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003). In order to defeat a motion for summary judgment, the nonmoving party "must make a showing sufficient to establish any essential element of [his] cause of action for which [he] will bear the burden of persuasion at trial." *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997); *see also Celotex*, 477 U.S. at 322-23. "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement. The nonmoving party must show that there is evidence upon which a jury reasonably could find for [him]." *Wheeler*, 539 F.3d at 634 (internal citation omitted).

On summary judgment, the Court limits its analysis of the facts to the evidence that is supported by the parties' Local Rule 56.1 statements properly before the Court. *Bay Area Bus. Council, Inc.*, 423 F.3d at 634; *Bordelon*, 233 F.3d at 529. When a proposed statement of fact is supported by the record and not adequately controverted by the nonmoving party, the Court will accept that statement as true. *Alberio v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001). To

adequately dispute a statement of fact, the nonmoving party must cite specific support in the record; an unsubstantiated denial or a denial that is mere argument or conjecture is not sufficient to create a genuinely disputed issue of material fact. *See id.* Factual disputes "are genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmovant." *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 676 (7th Cir. 2001) (internal citations and quotation marks omitted). The existence of a disputed issue of material fact will be sufficient to avoid summary judgment only if the disputed fact is determinative to the outcome under the applicable law. *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010).

## ANALYSIS

## I.     Count I: De's race discrimination claim pursuant to 42 U.S.C. § 1981

In Count I, De claims that the City illegally discriminated against him on the basis of his race in violation of 42 U.S.C. § 1981: (1) in 2002, by promoting Christopher Jaeger, a Caucasian male with allegedly inferior educational qualifications and experience, to the DIS position to which De also applied and for which he claims to have been fully qualified, (R. 23, Pl.'s Second Am. Compl. ¶¶ 9-11); (2) in 2007, by choosing Lawrence Olszak, a Caucasian male who also had allegedly inferior qualifications and experience, to succeed Jaeger as the DIS, (*id.* ¶¶ 12-14); (3) in 2007-2008, by relocating De from his office to a cubicle while allowing other employees who were not Asian Indians to keep their offices, (*id.* ¶¶ 17-19); and (4) in 2008, by terminating him even though he claims that he had more experience and was "superior in performance to similarly-situated employees within the division who were not terminated," (*id.* ¶¶ 21-23).

Section 1981 of the Civil Rights Act of 1866 prohibits discrimination on the basis of race in the making, enforcing, and terminating of contracts, including employment contracts. 42 U.S.C. § 1981; *Johnson v. Ry. Express Agency, Inc.,* 421 U.S. 454 (1975); *O'Leary v. Accretive*

*Health Inc.*, 657 F.3d 625, 630 (7th Cir. 2011) (citing *Kyles v. J.K. Guardian Sec. Serv., Inc.*, 222

F.3d 289, 302-03 (7th Cir. 2000)). Section 1981 provides that "[a]ll persons within the

jurisdiction of the United States shall have the same right in every State and Territory to make

and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all

laws and proceedings for the security of persons and property as is enjoyed by white citizens,

and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every

kind, and to no other." 42 U.S.C. § 1981(a). The statute defines "make and enforce contracts"

as "the making, performance, modification, and termination of contracts, and the enjoyment of

all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C.

§ 1981(b). Litigants most commonly invoke § 1981 to assert their rights to be free from

discrimination in the making and enforcing of employment contracts. *Pourghoraishi v. Flying J,*

*Inc.*, 449 F.3d 751, 756 (7th Cir. 2006).

    To state a cause of action for race discrimination under § 1981, a plaintiff must prove that

(1) he is a member of a racial minority; (2) the defendant had an intent to discriminate on the

basis of race; and (3) the discrimination concerned the making or enforcing of a contract. *Id.* To

establish that the alleged discrimination falls within the scope of activities proscribed by the

statute, a plaintiff asserting a § 1981 claim must also demonstrate that he suffered "a materially

adverse employment action."[8] *Lewis v. City of Chi.*, 496 F.3d 645, 652 (7th Cir. 2007) ("The

purpose of the adverse employment action requirement is to provide a reasonable limiting

principle for the type of conduct actionable under the statute.") (internal quotation marks

---

[8] While the phrase "materially adverse employment action" does not appear in the statute, it is
employed by courts as a "judicial gloss . . . that often may help to express the idea . . . that it is
essential to distinguish between material differences and the many day-to-day travails and
disappointments that, although frustrating, are not so central to the employment relation that they
amount to discriminatory terms and conditions." *Dass v. Chi. Bd. of Educ.*, 675 F.3d 1060, 1069
n.9 (7th Cir. 2012).

omitted). "To succeed on a race discrimination claim under § 1981, plaintiffs may proceed under either the direct or indirect method[s]" of proof. *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 820 (7th Cir. 2006) (citing *Dandy v. United Parcel Serv. Inc.*, 388 F.3d 263, 272 (7th Cir.2004)).

In order to state a claim under § 1981 against a state actor, government entity, or municipality, a plaintiff must establish municipal liability under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), and its progeny. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735-36 (1989) ("[T]o prevail on his claim for damages against the [defendant], petitioner must show that the violation of his 'right to make contracts' protected by § 1981 was caused by a custom or policy within the meaning of *Monell* and subsequent cases."). A plaintiff's failure to establish *Monell* liability entitles the municipal defendant to summary judgment. *Phelan v. Cook Cnty.*, 463 F.3d 773, 790 (7th Cir. 2006) (county employee failed to establish municipal liability because although she presented evidence that multiple coworkers subjected her to sexual harassment and gender discrimination, she failed to weave the separate incidents together into a cognizable policy; therefore, the county was entitled to summary judgment on her civil rights claim); *Smith v. Chi. Sch. Reform Bd. of Trs.*, 165 F.3d 1142, 1148 (7th Cir. 1999) ("[*Monell*] identifies an element of a plaintiff's claim, so the burden is on the plaintiff to demonstrate the essential policy or custom."). Additionally, as there is no *respondeat superior* liability under § 1981, a plaintiff must establish that the municipal entity itself, and not one of its employees, is responsible for the alleged violation of § 1981 within the meaning of *Monell* and subsequent cases. *Jett*, 481 U.S. at 735-38 ("We thus affirm the judgment of the Court of Appeals to the extent it holds that [a state actor, government entity, or municipality] may not be held liable for its employees' violation of the rights enumerated in § 1981 under a

theory of *respondeat superior*."); *Moore v. City of Chi.*, 126 Fed. App'x 745, 747 (7th Cir. 2005) ("To properly allege a claim under 42 U.S.C. § 1981, a plaintiff must show that the rights violation was caused by a custom or policy within the meaning of *Monell.*") (internal citations and quotation marks omitted); *Smith*, 165 F.3d at 1148 ("[R]ecovery against a governmental body under § 1981 may not be based on *respondeat superior*. The plaintiff must show that the body's official policy or custom was discriminatory."). To succeed in establishing municipal liability, a plaintiff must show that the state actor's, government entity's, or municipality's official policy or custom is discriminatory. *Monell*, 436 U.S. at 694; *Smith*, 165 F.3d at 1148 ("[R]ecovery against a governmental body under § 1981 may not be based on *respondeat superior*. The plaintiff must show that the body's official policy or custom was discriminatory."). This may be done by producing evidence of "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Roach v. City of Evansville*, 111 F.3d 544, 548 (7th Cir. 1997). In cases in which the defendant is a state actor, government entity, or municipality, a cause of action to vindicate the rights secured by § 1981 must be brought pursuant to 42 U.S.C. § 1983. *Jett*, 491 U.S. at 732-733.

The City contends that De's § 1981 claim fails as a matter of law because he has failed to: (1) establish municipal liability, (R. 41, Def.'s Mem. at 3-5); (2) demonstrate that he suffered a materially adverse employment action, (*id.* at 5-9); or (3) adduce evidence of discrimination under either the direct or indirect methods of proof, (*id.* at 9-13).

**A.     Municipal liability**

In *Jett v. Dallas Independent School District*, 491 U.S. at 731, the Supreme Court held that § 1981 does not provide a cause of action against local state actors, government entities, or municipalities. The Court concluded that a plaintiff must assert a cause of action against state actors under § 1983 to remedy violations of the civil rights secured by § 1981. *Id.* ("We hold that the express 'action at law' provided by § 1983 for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws,' provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor.") (quoting 42 U.S.C. § 1983). The Seventh Circuit has interpreted *Jett* to stand for the proposition that § 1983 is the exclusive means of enforcing the rights secured by § 1981 against state actors, and that § 1983 is the exclusive means of bringing suit under § 1981. *Naficy v. Ill. Dep't of Human Servs.*, 697 F.3d 504, 509 (7th Cir. 2012) ("42 U.S.C. § 1983. . . constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981.") (quoting *Jett*, 491 U.S. at 733) (internal citations and quotation marks omitted); *Von Zuckerstein v. Argonne Nat'l Lab.*, 78 F.3d 587, *2 (7th Cir. 1996). The other Courts of Appeals have interpreted *Jett* in the same manner as the Seventh Circuit. *See, e.g., Jones v. McNeese*, 675 F.3d 1158, 1160 n.1 (8th Cir. 2012) ("When raised directly against a state actor, a § 1981 claim must be brought under § 1983."); *Jones v. City of Franklin*, 309 Fed. App'x 938, 942 (6th Cir. 2009) ("[T]he § 1981 claim was barred because the plaintiffs did not plead a cause of action under § 1983, which provides the exclusive remedy for § 1981 claims brought against a municipality."); *Ford v. Se. Penn. Transp. Auth.*, 374 Fed. App'x 325, 326 (3d Cir. 2010) ("No private right of action lies against a state actor under § 1981. The exclusive remedy for relief from a state agency for civil rights violations, including race discrimination, is § 1983."); *Bryant v. Jones*, 575 F.3d 1281, 1288 n.1 (11th Cir. 2009) ("We have held that § 1981 does not provide

an implicit cause of action against state actors; therefore, § 1983 constitutes the exclusive federal remedy for violation by state actors of the rights guaranteed under § 1981."); *Patterson v. Cnty. Of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004) ("Indeed, the express cause of action for damages created by § 1983 constitutes the *exclusive* federal remedy for violation of the rights guaranteed in § 1981 by state governmental units.") (quoting *Jett*, 491 U.S. at 733) (internal quotation marks omitted); Ogden *v. Oktibbeha Cnty., Miss.*, 246 F.3d 458, 462 (5th Cir. 2001) ("Plaintiffs may also pursue a § 1983 cause of action against persons acting under color of State law in order to assert their substantive rights under § 1981."); *Dennis v. Cnty. of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995) ("To the extent that these claims were pleaded under § 1981, they run afoul of *Jett*[ ]. *Jett* held that when suit is brought against a state actor, § 1983 is the exclusive federal remedy for violation of the rights guaranteed in § 1981.") (quoting *Jett*, 491 U.S. 733) (internal quotation marks omitted).    Section 1983 provides that every person who, under color of law, deprives another of "any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . . ." 42 U.S.C. § 1983. Thus, while § 1981 creates *rights*, § 1983 provides the *remedy* to enforce those rights against state actors, government entities, or municipalities.

In reaching its conclusion in *Jett*, the Supreme Court carefully examined the relationship between the Civil Rights Act of 1866, which created the rights now enumerated in § 1981, and the Civil Rights Act of 1871, which enacted the precursor statute to § 1983. *Id.* at 713-31. The Court first found the express language of § 1981 to be "completely silent" on the issue of whether or not the statute created a private cause of action against state actors. *Id.* at 712. The Court determined that although the 1866 Act did not contain its own remedial provision,

Congress had enacted the 1871 Act "to expose state and local officials to a new form of liability" that had theretofore not existed under the 1866 Act. *Id.* at 723 (quoting *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 259 (1981)). Put differently, Congress believed that the 1871 Act, the precursor to § 1983, was necessary because no federal cause of action existed to enforce violations of civil rights by state actors. Thus, the language of § 1983 creates a cause of action for persons deprived of any civil right by a person acting under color of State law, including the "rights guaranteed by § 1981." *Jett*, 491 U.S. at 733.

"When a rights-creating statute contains no express cause of action, courts may either find that a private cause of action is implicit in the rights-creating statute or that a means of enforcing that right is contained elsewhere in federal law." *McGovern v. City of Phil.*, 554 F.3d 114, 117 (3d Cir. 2009) (citing *Arendale v. City of Memphis*, 519 F.3d 587, 594 (6th Cir. 2008)). Although § 1981, the rights-creating statute, contains no express private cause of action, the Supreme Court held in *Jett* that the means of enforcing those rights created by § 1981 against state actors lay in § 1983, a separate piece of federal law. *Jett*, 491 U.S. at 731. By contrast, the Court did find in § 1981 an implied right of action against private actors because no other federal statute provided a remedy at law against them. *Id.* at 732. As § 1983 provided a remedy against discrimination by persons acting under color of State law, the Court refused to read an implied private cause of action against state actors into the language of § 1981. *Id.* The Court reasoned: "That we have read [§ 1981] to reach private action and have implied a damages remedy to effectuate the declaration of rights contained in that provision does not authorize us to do so in the context of the 'state action' portion of § 1981, where Congress has established its own remedial scheme." *Id.* at 731.

Since Congress passed the Civil Rights Act of 1991, many courts have confronted the continuing significance of the Supreme Court's decision in *Jett*. The 1991 Act amended § 1981, in part by adding subsection (c), which states that the rights secured by § 1981 "are protected against impairment by nongovernmental discrimination and impairment under color of State law." 42 U.S.C. § 1981(c). Some courts have suggested that the "impairment under color of State law" language in subsection (c) of the amended statute abrogated the holding in *Jett* by creating an implied private right of action against state actors beyond that provided by § 1983. *See, e.g., Fed'n of African Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1214 (9th Cir. 1996) ("[W]e conclude that the amended 42 U.S.C. § 1981 contains an implied cause of action against state actors, thereby overturning *Jett*'s holding[.]"). The courts that have adopted the view that in the Civil Rights Act of 1991 Congress created an implied cause of action against state actors, government entities, or municipalities, pursuant to § 1981(c) itself, and thus overruled the holding of *Jett* that § 1983 is the exclusive means of enforcing the rights established by § 1981, are in a very small minority.

Since its enactment, seven Courts of Appeals have considered whether the 1991 Act created an implied private right of action against state actors, government entities, or municipalities under § 1981(c). However, the Seventh Circuit is not among those courts that have reached the issue. All but one of the Courts of Appeals that have decided the issue concluded that Congress *did not* create a private cause of action against state actors, government entities, or municipalities when it amended § 1981, and that therefore *Jett* remains good law. *Compare McGovern*, 554 F.3d at 120-21 (3d Cir. 2009) ("Nothing in the 1991 amendments or its legislative history evinces Congress's desire to alter the Supreme Court's conclusion in *Jett*."); *Arendale*, 519 F.3d at 598-99 ("[N]o independent cause of action against municipalities is

created by § 1981(c)."); *Bolden v. City of Topeka*, 441 F.3d 1129, 1137 (10th Cir. 2006) ("We therefore conclude that even after the 1991 amendments to § 1981, damages claims against state actors for § 1981 violations must be brought under § 1983."); *Oden v. Oktibbeha Cnty.*, 246 F.3d 458, 463-64 (5th Cir. 2001) ("[W]e are not willing to deviate from the Supreme Court's analysis of § 1981 in *Jett*."); *Butts v. Cnty. of Volusia*, 222 F.3d 891, 894 (11th Cir. 2000) ( "[Section] 1981(c) makes clear that the section creates a right that private or state actors may violate but does not itself create a remedy for that violation."); *and Dennis*, 55 F.3d at 156 n.1 ("We do not believe that [*Jett*] was affected by the Civil Rights Act of 1991, which added subsection (c) to § 1981."), *with Fed'n of African Am. Contractors*, 96 F.3d at 1214 (holding that the 1991 Act overruled *Jett*).

In addition to the consensus among the Courts of Appeals, a number of district courts in this Circuit have faced the continuing vitality of *Jett* in light of the Civil Rights Act of 1991, and have likewise concluded that the 1991 Act did not create an implied right of action under § 1981 and thus did not overrule *Jett*, leaving § 1983 as the exclusive means of obtaining relief against state actors for violations of the rights secured by § 1981. *See, e.g., Harrison v. Ill. Dep't of Transp.*, No. 10—CV—4674, 2011 WL 2470626, at *5 (N.D. Ill. June 21, 2011) (Noting that "most courts that have examined the issue have determined that the amendment . . . did not create a new cause of action," and holding that "a violation of the rights guaranteed in § 1981 by a state actor is properly brought as a so-called 'and laws' § 1983 claim[.]"); *Renta v. Cook Cnty.*, 735 F. Supp. 2d 957, 976 n.7 (N.D. Ill. 2010) ("Section 1983 provides the exclusive remedy for § 1981 claims when the defendant is a state actor."); *Tevebaugh v. City of Indianapolis*, No. 1:000—cv—1177—SEB—DML, 2010 WL 987726, at *2 (S.D. Ind. Mar. 15, 2010) ("[T]he 1991 amendments do not affect the holding in *Jett* and that § 1983 remains the sole avenue of

31

relief against state actors for alleged violations of § 1981."); *Cooper v. Ill. Dep't of Nat'l Res.*, No. 09—CV—3333, 2010 WL 2178720, at *3 (C.D. Ill. May 28, 2010) ("Section 1983 is the exclusive remedy for enforcement of Section 1981 claims against state actors."); *Greater Indianapolis Chapter of N.A.A.C.P. v. Ballard*, 741 F. Supp. 2d 925, 941 (S.D. Ind. Sept. 16, 2010) ("This court has held that the 1991 amendments did not affect the holding in *Jett*, and [ ] section 1983 remains the sole avenue of relief against state actors for alleged violations of section 1981."); *Mohr v. Chi. Sch. Reform Bd. of Trs.*, 99 F. Supp. 2d 934, 938-39 (N.D. Ill. 2000) (Finding that "until the Seventh Circuit or the Supreme Court says otherwise, *Jett* remains binding[.]"); *Tabor v. City of Chi.*, 10 F. Supp. 2d 988, 991-92 (N.D. Ill. 1998) ("This court agrees with those courts that have held that *Jett* remains good law. Both the plain language of § 1981(c) and the legislative history of the Civil Rights Act of 1991 support this conclusion."); *Nolen v. City of Chi.*, No. 97—CV—6608, 1998 WL 111675, at *6 (N.D. Ill. Mar. 4, 1998) ("[W]e see nothing in the text, legislative history or structure of the Civil Rights Act to indicate that Congress intended to overrule *Jett* . . . when it enacted Section 1981(c)."); *McPhaul v. Bd. of Comm'rs of Madison Cnty.*, 976 F. Supp. 1190, 1193 (S.D. Ind. 1997) ("*Jett* was not overruled by the Civil Rights Act of 1991 and accordingly § 1983 remains the sole avenue of relief against state actors for violations of § 1981.").

With no guidance from the Seventh Circuit on the issue, the Court must independently determine whether the Civil Rights Act of 1991 amended § 1981 to create a private right of action independent of § 1983, thereby nullifying the holding in *Jett* that § 1983 is the exclusive means of obtaining relief against a state actor, government entity, or municipality for violations of the rights secured by § 1981. Beginning with the text and structure of § 1981(c), the Court notes the distinction that exists between *rights* and *remedies*. "The fact that § 1981(c) places an

individual's *rights* on equal footing against discrimination by private as well as public actors does not necessarily imply the existence of an equal *remedy* against all defendants." *McGovern,* 554 F.3d at 119 (citing *Butts,* 222 F.3d at 894). This is particularly true where Congress has already provided an effective solution for redressing a plaintiff's rights under § 1981 elsewhere in federal law, as it has done here. *Jett,* 491 U.S. at 731. According to *Jett,* § 1983 provides just such an effective means of vindicating the rights secured by § 1981. Simply mentioning "rights," without more, does not establish a private right of action—the word "rights" is not a talisman. *Arendale,* 519 F.3d at 596.

Turning to the legislative history of the Civil Rights Act of 1991, it is evident that Congress was not concerned with *Jett* when it amended the statute. One of Congress's stated purposes in passing the Act was "to respond to recent decisions of the Supreme Court by expanding the scope of relevant civil rights statutes in order to provide adequate protection to victims of discrimination." Civil Rights Act of 1991, § 3(4), Pub. L. No. 102-166, 105 Stat. at 1071 (1991). The House Report on the bill explains that it was Congress's belief that the Supreme Court had "cut back dramatically on the scope and effectiveness of civil rights protections, and that as a result, existing protections and remedies [were] not adequate to deter unlawful discrimination or to compensate victims of intentional discrimination." H.R. Rep. No. 102-40(I), at 18 (1991), *reprinted in* 1991 U.S.C.C.A.N. 549, 556. Therefore, the Court must determine whether *Jett* was one of the decisions that Congress thought "cut back dramatically" on civil rights protections.

Congress intended subsection § 1981(c) of the Act to codify *Runyon v. McCrary,* 427 U.S. 160 (1976), in which the Supreme Court held that § 1981 prohibited intentional racial discrimination in private, as well as public, contracting. H.R. Rep. No. 102-40 (II), at 37 (1991),

1991 U.S.C.C.A.N. at 731. This reading of the statute comports with the goals of the 1866 Act, which made all racial discrimination illegal, even if it occurred in private. *See Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 437 (1968) (Holding that the 1866 Act "bars all racial discrimination, private as well as public[.]"); *Mahone v. Waddle*, 564 F.2d 1018, 1028-9 (3d Cir. 1977), *cert. denied*, 438 U.S. 904 (1978) ("Congress thus believed that the Civil Rights Act of 1866 would prohibit all racial discrimination."). The Supreme Court later questioned *Runyon*'s holding in *Patterson v. McLean Credit Union*, 491 U.S. 164, 172-73 (1989), but ultimately decided not to overrule *Runyon* on the grounds of *stare decisis*. Nervous that future courts might not be as willing to invoke the doctrine of *stare decisis* and in turn overrule *Runyon*, Congress passed § 1981(c) to securely codify the holding of *Runyon* and overrule *Patterson*. *See Arendale*, 519 F.3d at 598 ("The legislative history on § 1981(c) indicates that it was intended to codify *Runyon v. McCrary* . . . [and] . . . we conclude that § 1981(c) was directed at preserving the Supreme Court's decision in *Runyon*, not, as Plaintiff argues, at overruling *Jett*.") (citing *Bolden*, 441 F.3d at 1136 (holding that Congress intended § 1981(c) to codify *Runyon*); *Butts*, 222 F.3d at 894 (same)); *Taylor v. W. and S. Life Ins. Co.*, 966 F.3d 1188, 1199 (7th Cir. 1992) ("On November 21, 1991. . . Congress enacted the Civil Rights Act of 1991 and thereby overruled the relevant portion of *Patterson*."). However, the codification of *Runyon* accounted for rights only. *McGovern*, 554 F.3d at 120 (citing *Butts*, 222 F.3d at 894). Section 1981(c) created a substantive right that both private and state actors must refrain from violating, but the amendment *did not create a remedy* for a violation of that right. *See Butts*, 222 F.3d at 894.

There is nothing in the 1991 amendments or their legislative history that suggests that Congress intended to alter the Supreme Court's decision in *Jett* or displace its holding that § 1983 provides the sole remedy for violations of § 1981 by state actors, government entities, or

municipalities. *Jett* was never mentioned in the debates despite the fact that it was decided less than two years before Congress promulgated the 1991 Act. "[O]nly one who never relies on committee reports would fail to be impressed by the total absence in the committee reports of any mention of *Jett*[.]" *Bolden*, 441 F.3d at 1137. Congress does not overrule recently decided Supreme Court precedent so subtly. In light of the long-standing canon of statutory construction that repeals by implication are disfavored, *National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 662 (2007); *Posadas v. National City Bank of N.Y.*, 296 U.S. 497, 503 (1936), this Court would expect to see a great deal more than complete silence if Congress intended to overrule a case as notable as *Jett*. The Court interprets Congress's complete silence as evidencing a lack of intent to modify *Jett*. The 1991 amendments to § 1981 do not expressly provide a private cause of action, which is what one would expect to see if Congress did intend to set *Jett* aside. Therefore, because Congress neither explicitly created a *remedy* against state actors under § 1981(c), nor expressed its intent to overrule *Jett*, the Court finds that *Jett* remains good law and that "the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units." *Jett*, 491 U.S. at 733.

De does not plead his § 1981 discrimination claim against the City pursuant to § 1983, as required by the Supreme Court's decision in *Jett*. (*See* R. 23, Second Am. Compl. ¶¶ 24-28) (lacking any mention of § 1983 in the portion of De's complaint alleging a violation of § 1981). Nor does he allege that his § 1981 claim is brought pursuant to § 1983 in his memorandum of law in opposition to summary judgment. (*See* R. 45, Pl.'s Resp.) (omitting reference to § 1983 altogether). As § 1981 standing alone does not create a cause of action against municipalities, such as the City, De cannot establish municipal liability. *Jett*, 491 U.S. at 733; *Phelan*, 463 F.3d

at 790; *Smith*, 165 F.3d at 1148. Because "§ 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units," De's race discrimination claim brought against the City pursuant to § 1981 fails as a matter of law. *Jett*, 491 U.S. at 733. The Court need not proceed any further with its analysis of De's § 1981 claim; because De cannot establish municipal liability under § 1981 his claim must fall. Therefore, the City is entitled to judgment as a matter of law on De's claim asserted under 42 U.S.C. § 1981 contained in Count I of his second amended complaint.

## II.     Counts II and III: De's claims of discrimination pursuant to the Illinois Human Rights Act

### A.     The statutory scheme of the Illinois Human Rights Act

The IHRA, adopted in 1979, prohibits "unlawful discrimination," which the Illinois courts have interpreted to mean discrimination against an individual on the basis of, *inter alia*, race, religion, color, ancestry, national origin, age, marital status, sex, or handicap. 775 Ill. Comp. Stat. 5/1-102; *see also Blount v. Stroud*, 904 N.E.2d 1, 6 (Ill. 2009); *Owens v. Dep't of Human Rights*, 936 N.E.2d 623, 637 (Ill. App. Ct. 1st Dist. 2010). Specifically, the Act makes it a civil rights violation "[f]or any employer to refuse to hire, to segregate, or to act with respect to recruitment, hiring, promotion, renewal of employment, selection for training or apprenticeship, discharge, discipline, tenure or terms, privileges or conditions of employment on the basis of unlawful discrimination." 755 Ill. Comp. Stat. 5/2-102(A).

In *Mein v. Masonite Corp.*, 485 N.E.2d 312, 315 (Ill. 1985), the Illinois Supreme Court held that "the legislature intended the Act, with its comprehensive scheme of remedies and administrative procedures, to be the exclusive source for redress of alleged human rights violations." The *Mein* court held that under the then-current version of the Act, "courts have no jurisdiction to hear independent actions for civil rights violations." *Id.* Only final orders issued

36

by the Illinois Human Rights Commission were subject to narrow appellate review, and this was the limited extent to which the judiciary participated in enforcement of the Act. *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 458 (7th Cir.1994) (citing 775 Ill. Comp. Stat. 5/8–111(A)(1); *Mein*, 485 N.E.2d at 314-15). Prior to the 2008 amendments to the IHRA, the Illinois Human Rights Commission had exclusive jurisdiction to hear claims brought under the IHRA. *Manley v. City of Chi.*, 236 F.3d 392 (7th Cir. 2001); *see also* 775 Ill. Comp. Stat. 5/8-111(c) ("[N]o court of this state shall have jurisdiction over the subject matter of an alleged civil rights violation other than set forth in the Act.").

The Illinois legislature amended the Act in 2008 to give original jurisdiction over IHRA claims to the Illinois Human Rights Commission as well as the circuit courts of Illinois. 775 Ill. Comp. Stat. 5/7A-102(C)(4) ("[T]he complainant . . . [has a] right to seek review of the dismissal before the Human Rights Commission or commence a civil action in the appropriate circuit court."); 775 Ill. Comp. Stat. 5/71–102(F)(2) ("If the complainant chooses to commence a civil action in a circuit court, he or she must do so in the circuit court in the county wherein the civil rights violation was allegedly committed."); *Alexander v. Ne. Ill. Univ.*, 586 F. Supp. 2d 905, 910 (N.D. Ill. 2008). Now that IHRA claims can be brought in the circuit courts of Illinois, this Court must ascertain whether it has subject matter jurisdiction to hear De's claims arising under the Act.

Although the Seventh Circuit has not addressed the issue of whether federal courts may exercise jurisdiction over claims brought pursuant to the IHRA, the overwhelming majority of district courts within this Circuit that have confronted the issue have concluded that federal courts do have subject matter jurisdiction over IHRA claims based on supplemental jurisdiction

pursuant to 28 U.S.C. § 1367.[9] *See, e.g., Hoffman v. Bradley Univ.*, No. 11-1086, 2012 WL 4482173, at *1 (C.D. Ill. Sept. 27, 2012) ("The complaint also included claims arising under [the] Illinois Human Rights Act. Supplemental jurisdiction over those claims is found under 42 U.S.C. § 1367."); *Massenberg v. A & R Sec. Servs., Inc.*, No. 10—CV—7187, 2011 WL 1792735, at *5 (N.D. Ill. May 11, 2011) ("This court finds . . . that federal courts can exercise supplemental jurisdiction over IHRA claims."); *Lawrence v. E. Cent. Ill. Area Agency on Aging*, No. 10—CV—1240, 2011 WL 1044372, at *1 (C.D. Ill. Feb. 24, 2011) ("[T]he Court assumes without deciding that this amendment allows the District Court to exercise supplemental jurisdiction over a civil rights claims under the Illinois Human Rights Act."); *Carr v. Avon Prods., Inc.*, No. 10—CV— 3124, 2011 WL 43033, at *2 (N.D. Ill. Jan. 6, 2011) ("The Court's supplemental jurisdiction is defined by 28 U.S.C. § 1367, not the IHRA . . . . Thus, the Court has supplemental jurisdiction over [the IHRA claims] and, at this point, no reason not to exercise it."); *Yucus v. Peoples Nat'l Bank*, No. 09–609–GPM, 2010 WL 1416140, at *2 (S.D. Ill. Apr. 1, 2010) ([T]he language of the IHRA—as amended in January 2008—does not unequivocally confer *exclusive* jurisdiction upon Illinois State Courts. . . . this Court has power under 28 U.S.C. § 1367 to assume supplemental jurisdiction of plaintiff's [IHRA] claims."); *Glemser v. Sugar Creek Realty, Inc.*, No. 09–3321, 2010 WL 375166, at *2 (C.D. Ill. Jan. 26, 2010) ("The Court has supplemental jurisdiction over Plaintiff's Human Rights Act claims.'"); *Clark v. Moline Pub. Library*, No. 09–4054, 2010 WL 331726, at *3 (C.D. Ill. Jan. 26, 2010) ("[The] IHRA claim would appear to be amenable to the exercise of supplemental jurisdiction.").

---

[9] The "overwhelming majority" may, in fact, be a complete consensus. This Court is unable to find any case that has held that a federal court sitting in the stead of a circuit court of Illinois does not have supplemental jurisdiction over IHRA claims.

This Court agrees with the broad consensus of the district courts in this Circuit and holds that IHRA claims *may* be heard in a federal court sitting in the stead of a circuit court of Illinois based on supplemental jurisdiction pursuant to 28 U.S.C. § 1367. All of De's claims, state and federal, revolve around allegations that the CDOT discriminated against him. It is uncontested that the Court has original jurisdiction over De's § 1981 claim, as that claim arises directly under federal law. 28 U.S.C. § 1331. Because this is a "civil action of which the [C]ourt [has] original jurisdiction, the [Court] . . . [has] supplemental jurisdiction over all other claims that are so related in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). The inquiry to determine whether claims form part of the same case or controversy is whether the claims "derive from a common nucleus of operative facts." *City of Chi. v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164-65 (1997) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)). The Court concludes that De's IHRA claims do derive from a common nucleus of operative facts as his § 1981 claim because they are all founded on the same allegedly discriminatory conduct, allegedly committed by the same defendants, under the same allegedly discriminatory conditions of employment at the CDOT. Therefore, the Court concludes that it does have subject matter jurisdiction over De's national origin and sex discrimination claims brought under the IHRA pursuant to 28 U.S.C. § 1367.

## B.    Statute of limitations

The City maintains that all of De's claims alleged in Counts II and III pursuant to the IHRA are time-barred except for his claim arising out of his termination in the 2008 RIF. (R. 41, Def.'s Mem at 13-14.) Under the IHRA, an aggrieved party must file a charge of discrimination with the Illinois Department of Human Rights within 180 days after an alleged civil rights

violation occurs. 775 Ill. Comp. Stat. 5/7A-102. Compliance with the 180 day statutory time limit is a condition precedent to the right to seek a remedy under the IHRA. *Weatherly v. Ill. Human Rights Comm'n*, 788 N.E.2d 1175, 1178-79 (Ill. App. Ct. 1st Dist. 2003).

De filed a charge with the Illinois Department of Human Rights on December 11, 2008. (R. 23, Second Am. Compl. ¶ 4.) As such, only his claims regarding allegedly discriminatory conduct that occurred between June 14 and December 11, 2008, remain actionable under the statute and are potentially redressable by this Court. Therefore, the only remaining ground for De's claims of illegal discrimination on the bases of national origin and sex under the IHRA is his termination in the 2008 RIF.

Claims of discrimination based on Asian Indian national origin are cognizable under the IHRA. *Shah v. Ill. Human Rights Comm'n*, 548 N.E.2d 695, 701 (Ill. App. Ct. 1st Dist. 1989) ("[Plaintiff], as an Asian Indian, is clearly a member of a group protected from discrimination on the basis of national origin [under the IHRA]."). Claims of gender discrimination based on male gender are also cognizable under the Act. *See* 775 Ill. Comp. Stat. 5/1-103 ("'Sex' means the status of being male or female . . . [and] 'unlawful discrimination' means discrimination against a person because of his or her . . . sex.").

## C.    De's claims of discrimination in violation of the Illinois Human Rights Act

The Illinois Supreme Court instructs that in evaluating claims of discrimination brought under the IHRA, courts should apply the same test employed by federal courts in evaluating causes of action brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq. Zaderake v. Ill. Human Rights Comm'n*, 545 N.E.2d 684, 687 (Ill. 1989) (citing *St. Mary of Nazareth Hosp. Ctr. v. Curtis*, 516 N.E.2d 813, 815 (Ill. App. Ct. 1st Dist. 1987)). Under this

analysis, "a plaintiff may prove discrimination in one of two ways. He may attempt to meet his burden by presenting direct evidence that race was a determining factor in the employment decision, or he may use the indirect method of proof for Title VII cases" first established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973) ("The [plaintiff] . . . must carry the initial burden under the statute of establishing a *prima facie* case of racial discrimination. . . . The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection. . . . [The burden then shifts back to the plaintiff, who] must . . . be afforded a fair opportunity to show that [the defendant's] stated reason for [the plaintiff's] rejection was in fact pretext."). *Zaderaka*, 545 N.E.2d at 687; *Lalvani v. Ill. Human Rights Comm'n*, 755 N.E.2d 51, 64 (Ill. App. Ct. 1st Dist. 2001).

The City argues that De has waived his arguments in support of his claims alleging illegal discrimination in violation of the IHRA and that therefore De's IHRA claims in Counts II and III have been abandoned. (R. 48, Def.'s Reply at 15.) When assessing the City's argument, the Court is guided by the fundamental principle that "[i]t is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered," and present their arguments to the Court before it enters final judgment. *Reklau v. Merch. Nat'l Corp.*, 808 F.2d 628, 630 n.4 (7th Cir. 1986); *Anderson v. City of Wood Dale, Ill.*, No. 93—CV—425, 2001 WL 477158, at *4 (N.D. Ill. May 3, 2001) (citing *Arendt v. Vetta Sports, Inc.*, 99 F.3d 231, 237 (7th Cir. 1996); *Havoco of Am., Ltd. v. Sumitomo Corp. of Am.*, 971 F.2d 1332, 1336 (7th Cir. 1992)). If the opposing party fails to do so, the claim is deemed waived and the nonmoving party will lose the motion. *Reklau*, 808 F.2d at 630 n.4; *Anderson*, 2001 WL 477158, at *4. Furthermore, the opposing party waives any argument that it does not present and develop in its memorandum of law in opposition to

summary judgment. *Havoco of Am.*, 971 F.2d at 1336; *Arendt*, 99 F.3d at 237; *Laborers' Int'l Union v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (stating that arguments not presented to the district court in response to a summary judgment motions are waived) (internal citations omitted). A party's failure to meaningfully respond to a motion for summary judgment also constitutes waiver. *Cent. States, Se. and Sw. Areas Pension Fund v. Midwest Motor Express*, 181 F.3d 799, 808 (7th Cir. 1999). "[A] district court need not scour the record to determine whether there exists a genuine issue of fact to preclude summary judgment. Instead, the court can rely upon the non-moving party to show such a dispute if one exists." *L.S. Heath & Son, Inc. v. AT&T Info. Sys., Inc.*, 9 F.3d 561, 567 (7th Cir. 1993). In addition, a party will be deemed to have waived a claim for failing to cite both legal authority and supporting factual evidence. *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 708 (7th Cir. 2010); *Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005). The nonmoving party has the burden to "set forth specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Celotex Corp.*, 477 U.S. at 324. Failure to set forth any evidence or to develop any arguments in opposition to the moving party's summary judgment motion results in waiver of the nonmoving party's arguments and an abandonment of his claims. *See Palmer v. Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003) (deeming plaintiff's negligence claim abandoned because he failed to delineate it in his brief to the district court in opposition to summary judgment); *Laborers' Int'l Union v. Caruso*, 327 F.3d 588, 597-98 (7th Cir. 2003) (stating that arguments not presented to the district court in response to a summary judgment motion are waived); *Donelson v. City of Chi.*, 272 F. Supp. 2d 717, 726 (N.D. Ill. 2003) (finding that the plaintiff abandoned her claim because she provided no legal argument in support of her claim and because she made no serious effort to respond to the defendant's arguments); *Oak Brook Hotel Co. v. Teachers Ins. & Annuity Ass'n of Am.*, 846 F.

Supp. 634, 641 (N.D. Ill. 1994) (treating the plaintiff's failure to defend a particular claim in response to the defendant's motion for summary judgment as an abandonment of the claim).

As to the City's argument that it is entitled to summary judgment on De's IHRA claims, (R. 41, Def.'s Mem. at 13-15), De fails to develop any arguments whatsoever to refute the City's position that it is entitled to judgment as a matter of law, (R. 45, Pl.'s Resp. at 12-13). In opposing the City's position, De merely cites the cases that the City cited in its brief and states that they are "not helpful." (*Id.* at 12.) De does not offer any further explanation or support, and his response is therefore not meaningfully developed. *See Cent. States, Se. and Sw. Areas Pension Fund*, 181 F.3d at 808. Furthermore, the authorities that De cites in support of his claim and in opposition to the City are irrelevant. All of the cases De relies on concern the issue of pretext, as De seems to misunderstand the indirect, burden-shifting, method of proof under *McDonnell Douglas*; he fails to first establish a *prima facie* case of discrimination (perhaps he fails to recognize he must), before allowing the City to offer a legitimate, nondiscriminatory reason for its actions, at which point pretext is at issue and De may then rebut as pretextual the City's legitimate, nondiscriminatory reason for its actions. (R. 45, Pl.'s Resp. at 12-13) (citing *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 417 (7th Cir. 2006); *McClain v. Nw. Cmty. Corr. Ctr. Judicial Corrs. Bd.*, 440 F.3d 320, 333 (6th Cir. 2006); *Ross v. Kan. City Power & Light Co.*, 293 F.3d 1041, 1046 (8th Cir. 2002); *Alvarado v. Bd. of Trs.*, 928 F.2d 118, 122 (4th Cir. 1991); *Ibrahim v. N.Y. Dep't. of Health*, 904 F.2d 161, 167-8 (2d Cir. 1990)).

Accordingly, the Court finds that De has waived his IHRA claims because of his failure to meaningfully develop arguments in opposition to the City's motion. De claims to have relevant "evidence both that the employer's articulated reason could be deemed untrue by the jury and evidence of differential and less favorable treatment than the employees not selected for

termination." (R. 45, Pl.'s Resp. 12-13.) However, De never cites a single fact in support of such evidence, nor does he state what the evidence is. (*See* R. 45, Pl.'s Resp.) De argues that the CDOT discriminated against him in violation of the IHRA, but he fails to show how he would establish his claims, under either the direct or indirect methods of proof. *Salas v. Wis. Dep't. of Corr.*, 493 F.3d 913, 924 (7th Cir. 2007) (citing *Hojnacki v. Klein-Acosta*, 285 F.3d 544, 549 (7th Cir. 2002)) ("Although [the plaintiff] argued that the [defendant] retaliated against him . . . he does not outline how he would establish his claim under either the direct or indirect method."). A party's failure to identify evidence in support of his claim, or to explain how his evidence establishes a material question of fact, waives his argument. *Blanck v. Cohn*, 65 Fed. App'x 74, 76 (7th Cir. 2003) (citing *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 547 n.10 (7th Cir. 2002)) (noting that the district court told the plaintiff that courts will not "scour the record looking for factual disputes" or piece together appropriate arguments). De's unsubstantiated claim that he has evidence that supports his claims of illegal national origin and sex discrimination in violation of the IHRA does not satisfy his burden to "set forth specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Celotex Corp.*, 477 U.S. at 324. Thus, even if De's discrimination claims under the IHRA are not waived, his direct and indirect method claims fail because he offers no proof or evidence in support of them. *Salas*, 493 F.3d at 924 ("Even if [the plaintiff] did not waive his retaliation claim, his direct method claim fails because he lacks evidence[.]"). Therefore the Court finds that there are no triable issues of material fact to forestall summary judgment. The Court concludes that De's claims of illegal discrimination on the bases of national origin and sex in violation of the IHRA are waived and abandoned. Therefore, the City is entitled to judgment as a matter of law on Counts II and III of De's second amended complaint.

## CONCLUSION

For the foregoing reasons, the City's motion for summary judgment (R. 40) is GRANTED. The Clerk of the Court is directed to enter judgment in favor of the City of Chicago.

ENTERED: _____

**Judge Ruben Castillo**
**United States District Court**

**Dated: December 14, 2012**